UNITED STATES of America,
Plaintiff–Appellee,

v.

Reymundo MONTOYA–ORTIZ, and
Ruben Montoya, Defendants–
Appellants.

No. 92–8204.

United States Court of Appeals,
Fifth Circuit.

Nov. 12, 1993.

Rehearing Denied Dec. 13, 1993.

**1172**

H. Thomas Hirsch, Allen R. Stroder, H. Thomas Hirsch & Associates, Odessa, TX, for defendants-appellants.

Joan E.T. Stearns, Richard L. Durbin, Jr., Asst. U.S. Attys., Ronald F. Ederer, U.S. Atty., San Antonio, TX, for plaintiff-appellee.

Before WIENER, BARKSDALE, and DeMOSS, Circuit Judges.

BARKSDALE, Circuit Judge:

The challenges by Reymundo Montoya–Ortiz and Ruben Montoya–Lujan to their convictions and sentences for cocaine conspiracy and possession turn in large part on the use that can be made of evidence of prior similar acts. They contend, *inter alia*, that the evidence is insufficient to sustain their convictions. We AFFIRM.

## I.

Montoya–Ortiz and Montoya–Lujan are first cousins. They were convicted for conspiracy to possess with the intent to distribute more than five kilograms of cocaine, in violation of 21 U.S.C. §§ 841(a)(1) and 846, and possession with the intent to distribute more than five kilograms of cocaine, in violation of 21 U.S.C. § 841(a)(1).[1] Each was sentenced to life in prison.

## II.

### A.

Montoya–Ortiz and Montoya–Lujan contest the sufficiency of the evidence. Our

---

1. Montoya–Ortiz was originally indicted, with Edmundo Calixto Moreno and Jesus Ramos–Calderon, in October 1990. Moreno agreed to cooperate with the Government, and pleaded guilty in December 1990 to possession with the intent to distribute cocaine. In January 1991, he was sentenced to 97 months imprisonment. (A Fed. R.Crim.P. 35 motion for a reduction of Moreno's sentence was pending at the time of Appellants' trial.) Because the Government decided to pursue the investigation further, the indictment was dismissed without prejudice as to Ramos–Calderon and Montoya–Ortiz. They were re-indicted in December 1991, with Montoya–Lujan. Ramos–Calderon was a fugitive at the time of trial.

standard of review for such a contention is well established:

> When a challenge is made to the sufficiency of the evidence supporting a conviction, this court must decide whether a rational trier of fact could have found that the evidence established guilt beyond a reasonable doubt. We must view the evidence in the light most favorable to the verdict, accepting all credibility choices and reasonable inferences made by the jury. The standard is the same whether the evidence is direct or circumstantial.

*United States v. Gardea–Carrasco*, 830 F.2d 41, 43–44 (5th Cir.1987) (footnotes omitted). It is equally well established that "[i]t is not necessary that the evidence exclude every reasonable hypothesis of innocence or be wholly inconsistent with every conclusion except that of guilt.... A jury is free to choose among reasonable constructions of the evidence." *United States v. Bell*, 678 F.2d 547, 549 (5th Cir.1982), *aff'd*, 462 U.S. 356, 103 S.Ct. 2398, 76 L.Ed.2d 638 (1983).

"To establish a conspiracy under 21 U.S.C. § 846, the government must prove 'that a conspiracy existed, that each co-defendant knew of the conspiracy, and that each co-defendant voluntarily joined in it.'" *United States v. Simmons*, 918 F.2d 476, 483–84 (5th Cir.1990) (quoting *United States v. Molinar-Apodaca*, 889 F.2d 1417, 1423 (5th Cir.1989)). Proof of a formal agreement is not necessary; all that is required is proof beyond a reasonable doubt "[t]hat two or more persons in some way or manner, positively or tacitly, came to a mutual understanding to try to accomplish a common and unlawful plan". *Id.* at 484 (quoting *United States v. Williams–Hendricks*, 805 F.2d 496, 502 (5th Cir.1986)). "An agreement may be inferred from concert of action, participation from a 'collocation of circumstances' and knowledge from 'surrounding circumstances'". *United States v. Rodriguez*, 993 F.2d 1170, 1175 (5th Cir.1993).

For the substantive possession count, the Government is required to prove that a defendant knowingly possessed cocaine with the intent to distribute it. *E.g., id.* at 1175. "[P]ossession may be either actual or con-structive". *United States v. Smith*, 930 F.2d 1081, 1085 (5th Cir.1991). "'Constructive possession' has been defined as ownership, dominion, or control over the contraband itself, or dominion or control over the premises in which the contraband is concealed". *Id.* (emphasis in original).

The vehicles used for the offenses in issue departed from Presidio, Texas. Montoya–Lujan contends that the Government failed to prove beyond a reasonable doubt that he knowingly and intentionally joined the conspiracy, maintaining that the evidence showed only that he was present in Presidio at the time of those offenses. He contends, further, that there is no evidence to show that he constructively possessed the cocaine. Montoya–Ortiz similarly contends that the evidence was insufficient to establish the requisite knowledge and intent for conspiracy and possession with the intent to distribute. The evidence, viewed in the light most favorable to the verdict, was as follows.

On the afternoon of October 17, 1990, a pickup truck, pulling a flat-bed trailer loaded with bales of hay, entered the primary inspection area of the United States Border Patrol checkpoint south of Marfa, Texas. It was driven by Montoya–Ortiz; Jesus Ramos–Calderon (a/k/a Chuy) was a passenger.[2] Ramos–Calderon was known to Border Patrol agents to be involved in narcotics trafficking. The truck was referred to the secondary inspection area and a canine inspection was conducted. Although the dog showed interest in the bales of hay, no contraband was found. Montoya–Ortiz and Ramos–Calderon were taken inside the checkpoint trailer and interviewed. Montoya–Ortiz stated that they had come to Presidio to get hay at the Mario Pando Farm, downriver from Presidio, for his race horses, and that he leased the farm. There was evidence that, in the Presidio area, there is a Pando Farm that grows and sells alfalfa hay (the type on Montoya–Ortiz's trailer). Other testimony established that quality hay could be purchased in New Mexico, less than an hour's drive from Montoya–Ortiz's home in Andrews, Texas. On the other hand, Presi-

---

**2.** The truck was registered to Rosaria Montoya, Montoya–Ortiz's wife.

dio is about a three-hour drive from Andrews.

About 15 or 20 minutes after the truck driven by Montoya–Ortiz entered the checkpoint, and while he and Ramos–Calderon were still inside the checkpoint trailer, a second pickup truck loaded with bales of hay entered the primary inspection area. The truck was driven by Edmundo Calixto Moreno; it, too, was referred to the secondary inspection area. During a canine inspection, the dog alerted, indicating narcotics on the truck. Border Patrol Agent Casteneda advised Moreno of his rights and told him that he was being placed under arrest. As Ramos–Calderon had instructed him to do, Moreno indicated that he did not know anything about any narcotics. He appeared to be very nervous, licking his lips and wiping his hands on his pants.

Moreno was taken to the checkpoint trailer, where Montoya–Ortiz and Ramos–Calderon were being interviewed. Although, in a space about 10 by 20 feet, Moreno had to pass within two feet of Ramos–Calderon and Montoya–Ortiz, they gave no indication that they recognized Moreno, and appeared to deliberately ignore him. Agent Casteneda testified that Moreno and Ramos–Calderon looked at each other, and Moreno then turned away from Ramos–Calderon so quickly he "thought he was going to snap his head off at his shoulders".[3] Moreno told Agent Casteneda that he was from Kermit, Texas, and had borrowed a truck to go to Presidio to purchase hay. He stated that he had gone to a ranch and asked a woman where to purchase it; she took him to another place where he purchased 35 bales.

The truck driven by Moreno was searched; and, when the bales of hay were removed from the truck bed, eight duffel bags containing 484 pounds of cocaine (approximately 220 kilograms, with a street value of $12 to $13 million) were discovered. After Moreno was confronted with the results of the search, he admitted that he had lied about a woman assisting him in purchasing hay. He stated that he had taken the truck to a motel in

Presidio where others took the truck away from him and loaded it with hay and cocaine. The manager of the La Siesta Motel in Presidio testified that Moreno rented a room that day, and a receipt was introduced into evidence.

Moreno testified that Ramos–Calderon, who had been Moreno's boss when they worked in an oil field, picked him up in Kermit, Texas, on the morning of October 17, and drove him to the La Siesta Motel in Presidio. Ramos–Calderon instructed Moreno to rent a room and wait for him while he loaded the truck with cocaine. Ramos–Calderon returned about 45 minutes later and told Moreno that the truck was ready. Then another truck, driven by Montoya–Ortiz, arrived. Moreno testified that he had no direct contact with Montoya–Ortiz, but that each saw the other. Ramos–Calderon told Moreno that he was going to ride with Montoya–Ortiz; Moreno was to drive Ramos–Calderon's truck, with the cocaine. Moreno testified that Ramos–Calderon got into the passenger side of Montoya–Ortiz's truck, Montoya–Ortiz said something to Ramos–Calderon, and Ramos–Calderon then turned around and told Moreno to let them (Montoya–Ortiz and Ramos–Calderon) go ahead and to wait 20 minutes before following them to Odessa.

A few minutes after Moreno was brought into the checkpoint trailer, Montoya–Ortiz and Ramos–Calderon were released. Subsequently, a registration check on the vehicle driven by Moreno revealed that it was registered to Ramos–Calderon. Border Patrol agents therefore contacted area law enforcement agencies for assistance in stopping Montoya–Ortiz and Ramos–Calderon. They were stopped outside of Balmorhea, Texas, by Deputy Sheriff Floyd Estrada. Estrada's stepmother is Montoya–Ortiz's aunt. Montoya–Ortiz recognized Estrada, and got out of the truck to greet him, calling him by his first name, "Flavio". Montoya–Ortiz asked Estrada what was going on, and Estrada told him to keep his distance and that everything would be explained in time, because they were waiting for the Border Patrol to arrive

---

**3.** Moreno testified that, in the checkpoint trailer, Ramos–Calderon pretended not to know him,

and Montoya–Ortiz did not greet him.

from Marfa. Estrada testified that Montoya–Ortiz appeared to be extremely nervous and kept looking around and asking what was going on.

Border Patrol Agent Mendoza arrived 10–15 minutes later and advised Ramos–Calderon that there was some indication that he was connected to a narcotics seizure at the Marfa checkpoint. Ramos–Calderon stated that he had recognized the vehicle at the checkpoint and knew that Moreno was driving it. Ramos–Calderon said that he had turned away when Moreno was brought into the checkpoint trailer, and that he had not seen him, but that, upon leaving the trailer, he recognized Moreno's vehicle. Ramos–Calderon stated that the truck was registered in his name because, eight to nine months earlier, he had assisted Moreno in purchasing it. Ramos–Calderon told Agent Mendoza that Montoya–Ortiz had called him early that morning and had invited him to go with him to Presidio to get a load of hay.

While Agent Mendoza questioned Ramos–Calderon, Deputy Estrada questioned Montoya–Ortiz. Montoya–Ortiz said that he had been to Presidio, bought hay, and was on his way back to Kermit with it. Montoya–Ortiz told Deputy Estrada that his uncle, Florentino Montoya, had helped him load the hay. The truck and trailer were searched, but no contraband was found. Ramos–Calderon was taken into custody, but Montoya–Ortiz was allowed to leave with his truck and the hay. Deputy Estrada testified that Montoya–Ortiz just "took off", without even saying goodbye.

Based on his 14 years' experience with the Border Patrol, Agent Mendoza testified that he is familiar with the "lead truck/load truck" concept. According to Agent Mendoza, generally the lead truck does not contain narcotics. He testified that, although there is generally some means of communication between the lead and load vehicles, the purpose of a lead vehicle is either to alert or to distract. If it is stopped, the load vehicle driver is alerted that law enforcement agents are out and about. No communication devices were found in the lead truck driven by Montoya–Ortiz. Agent Mendoza testified that, because of Ramos–Calderon's reputation as a narcotics trafficker, his mere presence in the lead truck served as a distraction.

DEA Agent Mueller testified that the lead truck/load truck concept is a common practice used by narcotics smugglers. According to him, the lead truck can be anywhere from five minutes to an hour ahead of the load truck. He testified that, generally, the person who is in charge of the load will be in the lead truck so that there will be nothing to connect him to the load if it is intercepted by the authorities. He also testified that it is not unusual for persons who are more involved and powerful in a drug conspiracy to distance themselves from the drugs.

1.

None of the witnesses testified to having seen Montoya–Lujan on October 17. However, the manager of the La Siesta Motel identified Montoya–Lujan as having rented a room at the motel on October 16, for two persons, for two nights; check-out time was noon on October 18. The manager did not know who was staying with Montoya–Lujan. The motel has six rooms; Montoya–Lujan was in room 2; and Moreno rented room 4 on October 17. The manager also testified that Montoya–Lujan had stayed at his motel on several occasions prior to October 17.

Montoya–Lujan points out that there are only two motels in Presidio (the La Siesta being the least expensive), and that his presence there on October 17 is insufficient to establish his connection to the conspiracy or to show that he constructively possessed cocaine. If this were the only evidence against Montoya–Lujan, we would be inclined to agree; but, it is not. Agent Mueller testified that he was not surprised that Montoya–Lujan was not at the checkpoint on October 17, because it is common for the more powerful players in drug deals to distance themselves from the drugs. The most significant evidence of Montoya–Lujan's consciousness of guilt is Moreno's testimony that, while they were incarcerated together shortly before the trial, Montoya–Lujan approached Moreno and asked Moreno to deny knowing him (Montoya–Lujan) during the trial. In exchange, Montoya–Lujan offered to help Moreno's family (a wife and four young chil-

dren) when he got out, by giving them a car and some money.[4]

■ Over Montoya–Lujan's objection, evidence of prior similar acts was presented. See Fed.R.Evid. 404(b). Juan Gonzalez–King, who was serving a 97–month sentence for cocaine conspiracy and possession, testified that he had been in the narcotics business for eight years. He met Montoya–Lujan (nicknamed "Huero"[5]) in 1990. In August 1990, they were together at a ranch in Mexico, and received by airplane 750 kilograms of cocaine from Columbia. Gonzalez and Montoya–Lujan brought the cocaine to Ojinaga, Chihuahua, Mexico, just across the Rio Grande from Presidio. Gonzalez testified that his job was to receive the airplane in Mexico, refuel it, and send it back to Colombia; Montoya–Lujan's group was in charge of transporting the cocaine from Mexico into the United States.

Gonzalez testified that 200 of the 750 kilograms were transported through Presidio to Odessa, Texas. During the transportation, approximately 27 kilograms were "lost"; Gonzalez testified that he asked Montoya–Lujan about the missing cocaine, and that he got part of it back. Gonzalez testified also that he never paid Montoya–Lujan for transporting cocaine, because Montoya–Lujan would pay himself by stealing part of the merchandise. Rodrigo Rodriguez, Gonzalez's direct superior, who was serving a five-year sentence for cocaine conspiracy, testified that in September 1990, he received 150 kilograms of cocaine from Montoya–Lujan at a motel in Odessa to transport to Houston.

Moreno testified that he had been in Presidio several times under similar circumstances, and that he had seen Montoya–Lujan in Presidio and in Odessa with regard to other cocaine deals. Moreno testified that, on September 26, 1990 (just three weeks prior to the October 17 seizure at the Marfa checkpoint), he moved a load of cocaine from Presidio, through the Marfa checkpoint, to Odessa, with Montoya–Lujan and Ramos–Calderon. He testified that they used the lead truck/load truck method, and used hay to conceal the cocaine, which was packed in duffel bags. Moreno drove the load truck, following Montoya–Lujan and Ramos–Calderon in the lead truck. Just outside Odessa, they dumped the hay and moved six duffel bags of cocaine from Ramos–Calderon's truck (the load vehicle) to Montoya–Lujan's Bronco (the lead vehicle). Moreno testified that he participated in transporting two loads in September 1990, for which he was paid $8,500 by Ramos–Calderon. Moreno expected to be paid for the October 17 load, but no set price had been established.[6]

Montoya–Lujan does not challenge on appeal the admission, under Rule 404(b), of the evidence of prior similar acts. Instead, he contends that the jury should not have considered that evidence, because there was no evidence that he participated in any of the events of October 17. Regarding the similar acts evidence, the jury was instructed as follows:

> During this trial, you have heard evidence of acts of a defendant which may be similar to those charged in the indictment, but which were committed on other occasions. *You must not consider any of this evidence in deciding if a defendant committed the acts charged in the indictment.* However, you may consider this evidence for other, very limited, purposes.

> If you find beyond a reasonable doubt from other evidence in this case that a defendant did commit the acts charged in the indictment, then you may consider evidence of the similar acts allegedly committed on other occasions to determine:

> Whether a defendant had the state of mind or intent necessary *to commit the crime charged in the indictment;*

---

4. Larry Ozuna testified, on behalf of Montoya–Lujan, that he was incarcerated with Moreno and Montoya–Lujan; that Moreno attempted to talk to Montoya–Lujan; and that Montoya–Lujan did not want to talk to Moreno. Needless to say, we will not disturb the jury's credibility choice between the conflicting testimony of Ozuna and Moreno.

5. Moreno testified that Huero means "white Mexican".

6. Moreno testified that "the Montoyas" were going to pay Ramos–Calderon for the October 17 load; but the jury was instructed to disregard that testimony.

or

Whether a defendant had a motive or the opportunity to commit the acts charged in the indictment;

or

Whether a defendant acted according to a plan or in preparation for commission of a crime;

or

Whether a defendant committed the acts for which he is on trial by accident or mistake.

These are the limited purposes for which any evidence of other similar acts may be considered.[7]

Accordingly, if the jury found beyond a reasonable doubt that the physical acts in issue were committed, it could consider the evidence of Montoya–Lujan's prior similar acts to determine the state of mind with which he committed the acts in issue.[8]

Montoya–Lujan does not dispute the first element of a conspiracy—the existence of an agreement; but he contends that there is no evidence that he knew of the conspiracy or voluntarily joined it. The essence of a conspiracy is an agreement; proof of overt acts is not required to prove a conspiracy under 21 U.S.C. § 846. Each of the two disputed elements of the conspiracy charge involve Montoya–Lujan's state of mind. Therefore,

the jury properly could have considered evidence of Montoya–Lujan's prior similar acts with respect to each of these two elements.

Based on the testimony of the La Siesta motel manager, the jury reasonably could have concluded that Montoya–Lujan was present in Presidio on October 17, registered at the same motel as Moreno. It is true, as the jury was instructed, that *"mere* presence together at the scene of a crime or close association will not *alone* support the inference of a conspiracy".[9] *United States v. Simmons,* 918 F.2d 476, 484 (5th Cir.1990) (emphasis added). But, presence "is a 'significant factor to be considered within the context of the circumstances under which it occurs.'" *United States v. Evans,* 941 F.2d 267, 272 (5th Cir.) (quoting *United States v. Medina,* 887 F.2d 528, 533 (5th Cir.1989)), *cert. denied,* — U.S. —, 112 S.Ct. 451, 116 L.Ed.2d 468 (1991). "'Circumstances altogether inconclusive, if separately considered, may, by their number and joint operation, ... be sufficient to constitute conclusive proof.'" *United States v. Roberts,* 913 F.2d 211, 218 (5th Cir.1990), *cert. denied,* — U.S. —, 111 S.Ct. 2264, 114 L.Ed.2d 716 (1991) (quoting *United States v. Lechuga,* 888 F.2d 1472, 1476 (5th Cir.1989)). The jury properly could have considered the evidence of Montoya–Lujan's prior similar acts, including his previous stays at the La Siesta Motel, his previous trips to Presidio in connection with cocaine deals, and his involvement in transporting cocaine by methods substantially

7. This instruction is consistent with the Pattern Jury Instructions of the District Judges Association of the Fifth Circuit, Criminal Cases, Instruction No. 1.30 (1990). *See also* E. Devitt, C. Blackmar, M. Wolff & K. O'Malley, 1 *Federal Jury Practice & Instructions: Civil and Criminal,* § 17.08, at 661–62 (4th ed. 1992).

8. The Government asserts that the district court's instruction improperly limited the jury's consideration of evidence of Montoya–Lujan's conduct prior to October 17, 1990, because such evidence was intrinsic, rather than extrinsic. *See United States v. Royal,* 972 F.2d 643, 647–48 (5th Cir. 1992), *cert. denied,* — U.S. —, 113 S.Ct. 1258, 122 L.Ed.2d 655 (1993); *United States v. Torres,* 685 F.2d 921, 924 (5th Cir.1982). The Government, however, did not object to the instruction; accordingly, we will not consider this belated contention. *See* Fed.R.Crim.P. 30 ("No party may assign as error any portion of the charge or omission therefrom unless that party objects

thereto before the jury retires to consider its verdict, stating distinctly the matter to which that party objects and the grounds of the objection"); *United States v. Bigler,* 817 F.2d 1139, 1140 (5th Cir.) ("This court has repeatedly ruled that it will not consider issues that were not raised before the trial court"), *cert. denied,* 484 U.S. 842, 108 S.Ct. 130, 98 L.Ed.2d 88 (1987).

9. The jury was instructed:

Mere presence at the scene of an event, even with knowledge that a crime is being committed, or the mere fact that certain persons may have associated with each other, and may have assembled together and discussed common aims and interests, does not necessarily establish proof of the existence of a conspiracy. Also, a person who has no knowledge of a conspiracy, but who happens to act in a way which advances some purpose of a conspiracy, does not thereby become a conspirator.

identical to the one used on October 17, to determine that his presence at the La Siesta Motel on October 17 was not a mere coincidence, accident, or mistake, but was instead a part of concerted activity with Montoya–Ortiz, Ramos–Calderon, and Moreno in furtherance of the scheme to transport cocaine from Presidio.

■ Montoya–Lujan also contends that his conviction for possession with intent to distribute cocaine should be reversed, because the Government failed to establish possession, actual or constructive—*i.e.*, there was no evidence that he controlled or had the power to control either the truck or the cocaine. We disagree. Although Montoya–Lujan's presence at the La Siesta Motel is not enough, standing alone, to prove that he constructively possessed the cocaine, the jury properly could have considered his prior conduct to determine that he intended to exercise dominion and control over the cocaine that was being transported by others, and was in Presidio for that purpose. Montoya–Lujan's attempt to persuade Moreno to testify untruthfully is further evidence of his consciousness of guilt with respect to the possession charge.

### 2.

■ Montoya–Ortiz contends that he was convicted solely because he went to the La Siesta Motel on October 17 and picked up Ramos–Calderon, and then went through the Marfa checkpoint about 20 minutes before Moreno. This is far from a correct characterization of the evidence.

For starters, although Moreno could not hear what Montoya–Ortiz said to Ramos–Calderon outside the La Siesta Motel, immediately before Ramos–Calderon gave Moreno his instructions about following their truck, the jury reasonably could have found, based on the sequence of events, that Montoya–Ortiz and Ramos–Calderon were conversing about instructing Moreno regarding how long he should wait before following them. Based on this evidence, a rational juror could have inferred that Montoya–Ortiz was aware of the lead truck/load truck plan for transporting the cocaine through the checkpoint, and voluntarily participated in it.

In addition, there was other evidence of Montoya–Ortiz's guilt. He told the Border Patrol agents that he drove to Presidio (a three-hour drive from his home in Andrews) to purchase hay; but high-quality hay could be purchased in New Mexico (less than an hour's drive from Andrews). "This Court has acknowledged that a 'less-than-credible explanation' for a defendant's actions is 'part of the overall circumstantial evidence from which possession and knowledge may be inferred' ". *United States v. Diaz–Carreon*, 915 F.2d 951, 955 (5th Cir.1990). And, despite the fact that he had seen Moreno outside the La Siesta Motel earlier in the day, there was evidence that Montoya–Ortiz deliberately ignored Moreno when Moreno was brought into the checkpoint trailer. Montoya–Ortiz's extreme nervousness when stopped by his relative, Deputy Estrada, near Balmorhea, and the fact that he did not even say goodbye to his relative after Ramos–Calderon was taken into custody, are further evidence of his consciousness of guilt.

In sum, viewing the evidence and the inferences that may be drawn from it in the light most favorable to the verdict, we conclude that a rational trier of fact could have found the essential elements of the offenses beyond a reasonable doubt.

### B.

■ Montoya–Lujan contends that his conviction must be reversed because the prosecutor impermissibly commented on his failure to testify. The Fifth Amendment "prohibits a prosecutor from commenting directly or indirectly on a defendant's failure to testify" in a criminal case. *United States v. Wade*, 931 F.2d 300, 305 (5th Cir.) (quoting *United States v. Smith*, 890 F.2d 711, 717 (5th Cir.1989)), *cert. denied*, —— U.S. ——, 112 S.Ct. 247, 116 L.Ed.2d 202 (1991). "The test for determining if a constitutional violation has occurred is whether 'the language used was manifestly intended or was of such character that the jury would naturally and necessarily take it to be a comment on the failure of the accused to testify' ". *United States v. Rocha*, 916 F.2d 219, 232 (5th Cir. 1990) (quoting *Davis v. United States*, 357

F.2d 438, 441 (5th Cir.), *cert. denied,* 385 U.S. 927, 87 S.Ct. 284, 17 L.Ed.2d 210 (1966)), *cert. denied,* —— U.S. ——, 111 S.Ct. 2057, 114 L.Ed.2d 462 (1991). And, "the comments complained of must be viewed within the context of the trial in which they are made". *United States v. Dula,* 989 F.2d 772, 776 (5th Cir.1993). Reversal is not warranted unless the improper comment had "a clear effect on the jury". *United States v. Rocha,* 916 F.2d at 232.

During cross-examination, counsel for Montoya–Ortiz asked Moreno:

> Is there any other person that you know of that can corroborate your story about you being in Presidio and about Reymundo [Montoya–Ortiz] pulling up in his truck and Mr. Ramos[–Calderon] getting out of your truck and getting into his truck, anybody else that can corroborate your story that you know of?

Moreno answered "No, sir." On redirect, the prosecutor asked Moreno:

> [Montoya–Ortiz's counsel] or [Montoya–Lujan's counsel] asked you if there was anybody who could corroborate your testimony about being down in Presidio and doing these coke deals. Could Mr. Ruben Montoya[–Lujan] corroborate your testimony?

Montoya–Lujan's counsel objected, contending that the prosecutor was referring to the fact that Montoya–Lujan had not testified. The court instructed the jury that "[t]he defendant has no burden at all, and the jury will recognize that. The defendant does not have to prove his innocence...."

There is no evidence that the prosecutor's question was manifestly intended as a comment on Montoya–Lujan's failure to testify; nor does Montoya–Lujan expressly charge such intent. The comment complained of occurred during presentation of the Government's case-in-chief, prior to when Montoya–Lujan would have testified, had he elected to do so. Considering the context and timing of the question, we conclude that the jury would not naturally and necessarily have interpreted the question as a comment on Montoya–Lujan's failure to testify.

Moreover, the district court instructed the jury, both in response to Montoya–Lujan's objection and in its charge, that Montoya–Lujan was not required to prove his innocence, that he had a right not to testify, and that the jury could not consider his failure to testify. Even assuming the prosecutor's remark could be interpreted as a comment on Montoya–Lujan's failure to testify, any harm resulting from the remark was cured by the court's instructions. *See United States v. Dula,* 989 F.2d at 777.

### C.

Both of the Appellants raise several issues regarding sentencing. We "will uphold a sentence unless it was imposed in violation of law; imposed as a result of an incorrect application of the sentencing guidelines; or outside the range of the applicable sentencing guideline and is unreasonable." *United States v. Haymer,* 995 F.2d 550, 552 (5th Cir.1993) (quoting *United States v. Howard,* 991 F.2d 195, 199 (5th Cir.1993)). "Errors of law in applying the Sentencing Guidelines are fully reviewable on appeal." *United States v. Rocha,* 916 F.2d at 242. But, "findings of fact are entitled to considerable deference under the clearly erroneous standard of review." *Id. See United States v. Robins,* 978 F.2d 881, 889 (5th Cir.1992) ("The clearly erroneous standard applies to the factual determination of what quantity of drugs is implicated by the crime under consideration by the sentencing court"); *United States v. Watson,* 988 F.2d 544, 550 (5th Cir.1993) ("We review a district court's finding that a defendant was an organizer or leader under the clearly erroneous standard"). "[T]he district court need only determine its factual findings at sentencing by a preponderance of the relevant and sufficiently reliable evidence". *United States v. Angulo,* 927 F.2d 202, 205 (5th Cir.1991) (internal quotation marks and citation omitted).

### 1.

■ Montoya–Lujan contends that he was denied due process because the district court based its calculation of his base offense level on unreliable information regarding drug

quantities involved in unadjudicated extraneous offenses.

"Due process does require that information relied upon when determining an appropriate sentence have some minimal indicium of reliability and bear some rational relationship to the decision to impose a particular sentence." *United States v. Angulo*, 927 F.2d at 204 (internal quotation marks and citation omitted). "The guidelines provide that in resolving any disputed fact the court may consider any information that has 'sufficient indicia of reliability to support its probable accuracy' ". *Id.* at 204–05 (citing U.S.S.G. § 6A1.3, p.s.). "[A] presentence report generally bears sufficient indicia of reliability to be considered as evidence by the trial court in making the factual determinations required by the Guidelines. And it is proper for the district court to rely on a presentence report's construction of evidence to resolve a factual dispute, rather than relying on the defendant's version of the facts". *United States v. Robins*, 978 F.2d at 889.

The PSR states that, based on the DEA's investigation, Agent Mueller was of the opinion that the cocaine seized on October 17 was part of the 750–kilogram shipment from Colombia that Montoya–Lujan received in Mexico in August 1990. And, Agent Mueller testified at trial, based on his 20 years of experience with the DEA, including being stationed in Bogota, Colombia, for five years, that the cocaine seized on October 17 was 94% pure, industrial strength, cocaine that came straight from the laboratory; he opined that the source was the Medellin Cartel in Colombia.

Montoya–Lujan did not produce any evidence to contradict Agent Mueller's conclusion, and did not attempt to question Agent Mueller or the probation officer at the sentencing hearing. In light of the evidence regarding Montoya–Lujan's involvement with shipments of cocaine into the United States following the delivery of the 750–kilogram load to Mexico, and the temporal proximity between the shipment of the 750–kilogram load in August 1990 and the 220–kilogram seizure on October 17, we conclude that Agent Mueller's opinion is sufficiently reliable to support its probable accuracy. Mon-

toya–Lujan's due process rights were not violated.

### 2.

Pursuant to U.S.S.G. § 3B1.1, four points are added to the offense level if the defendant was an organizer or leader of criminal activity that involved five or more participants or was otherwise extensive. Each Appellant challenges receiving this adjustment, contending that the underlying leadership role finding was improperly based on unreliable evidence of collateral unadjudicated offenses.

### (a)

■ For his challenge to this finding, Montoya–Lujan contends again that he was denied due process. The probation officer's leadership conclusion concerning Montoya–Lujan was based on information provided to the probation officer by the United States Attorney and the DEA.

As stated, Agent Mueller's opinion that the 220 kilograms of cocaine seized on October 17 were part of the 750–kilogram load received by Montoya–Lujan in Mexico is sufficiently reliable to support its probable accuracy. At trial, there was testimony that Montoya–Lujan was in charge of transporting the 750 kilograms from Mexico into the United States. As also stated, although Agent Mueller was available to provide additional clarification, Montoya–Lujan did not question him or the probation officer at the sentencing hearing. We conclude that the finding regarding Montoya–Lujan's role in the offense is based on information that is sufficiently reliable to support its probable accuracy.

### (b)

■ Montoya–Ortiz asserts that, instead of this upward adjustment, he should have received a two- or four-level decrease as either a minimal or a minor participant. In assessing a defendant's role in the offense, "[i]t is not the contours of the offense charged that defines the outer limits of the transaction; rather it is the contours of the underlying scheme itself". *United States v.*

*Mir,* 919 F.2d 940, 945 (5th Cir.1990); *see also* U.S.S.G. § 3B1.1 introductory commentary ("The determination of a defendant's role in the offense is to be made on the basis of all conduct within the scope of § 1B1.3 (Relevant Conduct), ... and not solely on the basis of elements and acts cited in the count of conviction").

Accordingly, the district court was entitled to base its finding with respect to Montoya–Ortiz's role in the offense on reliable information that Montoya–Ortiz's involvement with the 220 kilograms of cocaine seized on October 17 was merely part of a larger scheme to distribute the 750 kilograms of cocaine shipped from Colombia to Mexico in August 1990. *See United States v. Michelena–Orovio,* 719 F.2d 738, 746 (5th Cir.1983) (*en banc*) ("Conspiracies to distribute narcotics have generally been considered to be prime examples of chain, or interconnected, conspiracies, in which a participant in a segment of the conspiracy may be convicted of participation in the whole"), *cert. denied,* 465 U.S. 1104, 104 S.Ct. 1605, 80 L.Ed.2d 135 (1984).

Montoya–Ortiz objected to the PSR's finding regarding his role on the ground that his attorney had no information about the DEA identifying him as an organizer or leader of a substantial drug smuggling organization. However, he did not question either Agent Mueller or the probation officer at the sentencing hearing regarding that investigation, nor did he contend that the results of the DEA investigation were inaccurate or otherwise unreliable. Based on both the PSR and the evidence introduced at trial, we conclude

that the district court did not clearly err in finding that Montoya–Ortiz occupied a leadership role in the offense.

**3.**

■ Montoya–Ortiz contends that the district court erred by increasing his offense level by two levels, pursuant to U.S.S.G. § 2D1.1(b)(1), for possession of a dangerous weapon. He does not dispute that, during a search following the stop near Balmorhea on October 17, a Ruger .357 Magnum pistol was found in the cab of the truck he was driving. Instead, he asserts that the district court was precluded from considering evidence of the weapon at sentencing, because it had suppressed evidence of the weapon at trial.

Our court recently held that "[t]he exclusionary rule applicable to Fourth Amendment violations is generally inapplicable to the district court's consideration of evidence for purposes of sentencing." *United States v. Robins,* 978 F.2d at 891. Although the evidence about which Robins complained was not suppressed at trial, *Robins* relied in part on *United States v. Torres,* 926 F.2d 321, 325 (3d Cir.1991), which held that evidence suppressed at trial for violation of the Fourth Amendment may later be considered in determining a defendant's base offense level under the Guidelines. *Robins,* 978 F.2d at 891–92. We agree.[10]

Along this line, the Sentencing Guidelines provide that "the court may consider relevant information without regard to its admissibility under the rules of evidence applicable

---

**10.** Montoya–Ortiz does not contend that the weapon was unconstitutionally seized for the sole purpose of enhancing his sentence. *See Robins,* 978 F.2d at 891–92 (discussing *Verdugo v. United States,* 402 F.2d 599 (9th Cir.1968) (prohibiting the use of illegally seized evidence at sentencing when such use would provide a substantial incentive for unconstitutional searches and seizures), *cert. denied,* 402 U.S. 961, 91 S.Ct. 1623, 29 L.Ed.2d 124 (1971)). *See also United States v. Tejada,* 956 F.2d 1256, 1263 (2d Cir.) ("Absent a showing that officers obtained evidence expressly to enhance a sentence, a district judge may not refuse to consider relevant evidence at sentencing, even if that evidence has been seized in violation of the Fourth Amendment"), *cert. denied,* —— U.S. ——, 113 S.Ct. 124, 121 L.Ed.2d 80 (1992); *United States v. Lynch,* 934 F.2d 1226, 1237 (11th Cir.1991) (declining to extend exclu-

sionary rule to sentencing proceedings), *cert. denied,* —— U.S. ——, 112 S.Ct. 885, 116 L.Ed.2d 788 (1992); *United States v. McCrory,* 930 F.2d 63, 68 (D.C.Cir.1991) (under particular facts of case, deterrent effect of exclusionary rule would not outweigh detrimental effect of excluding the evidence at sentencing), *cert. denied,* —— U.S. ——, 112 S.Ct. 885, 116 L.Ed.2d 788 (1992). *Contra, United States v. Nichols,* 979 F.2d 402, 410–11 (6th Cir.1992) ("exclusionary rule bars a sentencing court's reliance on evidence illegally seized during the investigation or arrest of a defendant for the crime of conviction in determining the defendant's sentence under the sentencing guidelines"). *Cf. United States v. Montez,* 952 F.2d 854, 856 (5th Cir.1992) (exclusionary rule does not apply in supervised release revocation hearings absent a showing of harassment).

at trial, provided that the information has sufficient indicia of reliability to support its probable accuracy." U.S.S.G. § 6A1.3(a). Montoya–Ortiz does not contend that there are insufficient indicia of reliability to support the probable accuracy of the evidence regarding the seized weapon. Accordingly, the district court did not err in considering the weapon for purposes of calculating Montoya–Ortiz's offense level.

### 4.

■ Montoya–Ortiz asserts that his base offense level should have been 38, based only on the 220 kilograms of cocaine seized on October 17, 1990. In the PSR, however, the probation officer found the level to be 40, based on 500–1,500 kilograms of cocaine. The district court overruled Montoya–Ortiz's objections to being held accountable for more than the 220 kilograms. Montoya–Ortiz contends again that the district court erred in finding that he had participated in other extraneous cocaine-related offenses, and in using quantities of cocaine involved in those offenses to determine his base offense level. Finally, he contends, albeit for the first time on appeal, that the district court erred by failing to make a specific finding that quantities of cocaine other than the 220 kilograms for which he was convicted were reasonably foreseeable to him.

We need not decide this issue, because even if the district court had considered only the 220 kilograms seized on October 17, we conclude that the same sentence would have been imposed. Accordingly, error, if any, in considering additional quantities of cocaine, and the lack of a finding on those additional quantities, was harmless. *See United States v. Johnson*, 961 F.2d 1188, 1189 (5th Cir. 1992) (citing *Williams v. United States*, —— U.S. ——, —— – ——, 112 S.Ct. 1112, 1120–21, 117 L.Ed.2d 341 (1992)) (remand for resentencing is unnecessary if "the district court would have imposed the same sentence").

As stated by Montoya–Ortiz, and based on the 220 kilograms, his base offense level would have been 38. U.S.S.G. § 2D1.1(c)(3). A base offense level of 38, plus a four-level increase for Montoya–Ortiz's role as an orga-

nizer or leader, and a two-level increase for possession of a dangerous weapon, results in a total offense level of 44, one level above the highest level in the sentencing table. U.S.S.G. Ch. 5, pt. A (Sentencing Table). The Guidelines sentence for a defendant with a total offense level of 43 and a criminal history category of II is life imprisonment. *Id.* Therefore, error, if any, with respect to the quantity of cocaine for purposes of calculating Montoya–Ortiz's base offense level was harmless.

### III.

The convictions and sentences of both Appellants are

### AFFIRMED.

DeMOSS, Circuit Judge, dissenting:

I am unable to concur with the conclusion reached by my colleagues in Part II, A 2 of the majority opinion, and I write to express my contrary view that the evidence in this case as to Montoya–Ortiz was not sufficient to support a jury finding of guilt beyond a reasonable doubt. I have agonized long and hard over the circumstances of this case, and I have come to the conclusion that the evidence against Montoya–Ortiz is not sufficient because the presumption of innocence and the requirement that the government prove its case beyond a reasonable doubt compel such a conclusion in a case such as this where the evidence is entirely circumstantial and the inferences to be drawn therefrom are not necessarily the result of the circumstantial facts.

My assessment of the sufficiency of the evidence in this case against Montoya–Ortiz has undoubtedly been colored by the following considerations which continually popped up in my mind as I analyzed the record in this case and thought through the implications of the evidence and testimony presented:

a. Montoya–Ortiz has received a sentence of life imprisonment. While I recognize that such a sentence is not as final as a death sentence, it is the next thing to it in that it results in the deprivation of this defendant's

liberty for the rest of his natural life on earth.

b. I am bothered by the disparity between the sentences which Montoya–Ortiz received and the sentence of 97 months received by the government's star witness, Moreno. Moreno was the person who drove the truck from which the 220 kilograms of cocaine were seized on October 17, 1990. Furthermore, Moreno admitted in his testimony that he drove another truck earlier in September carrying another load of cocaine. Using only the quantity of cocaine seized by the government on October 17, and assuming that Moreno had no criminal history points of any kind, his base offense level would have started at 38, which calls for a sentencing range of 235 to 293 months. Furthermore, as indicated by footnote 1 of the majority opinion, a motion for reduction of Moreno's sentence was pending at the time of Montoya–Ortiz's trial.

c. I am bothered by the sequence of the indictments in this case. The events for which Montoya–Ortiz has been sentenced to life in prison allegedly occurred on October 17, 1990. Montoya–Ortiz, Ramos Calderon, and Moreno were indicted in October 1990, and Moreno pleaded guilty to the charges of that indictment in December 1990. Thereafter, the original indictment was dismissed without prejudice as to Ramos Calderon and Montoya–Ortiz. Finally, in December 1991, Montoya–Ortiz and Ramos Calderon were re-indicted along with Montoya–Lujan. Given the requirements of the Speedy Trial Act, I have to conclude that the government dismissed its original indictment as to Montoya–Ortiz because they did not have sufficient evidence to bring those charges to trial within 70 days after the original indictment.

d. Finally, I am bothered by the veritable flood of Rule 404(b) testimony, admitted in this case, not only from Moreno but from three other convicted criminals turned government witnesses. All of this testimony, however, related to prior bad acts of Montoya–Lujan, not Montoya–Ortiz; and nowhere in any of this testimony does any witness even mention Montoya–Ortiz. Given that those whom the government has joined together in a conspiracy indictment have virtu-ally no opportunity of getting a severance for separate trials, the possibility that the jury decided that Montoya–Ortiz was guilty because there was so much testimony of bad conduct on the part of Montoya–Lujan is a very real and ever-present danger in this case.

With the foregoing in mind, and recognizing that Montoya–Ortiz meticulously preserved for appellate review his contention that the evidence in this case was insufficient, I examined the record in this case with a sense of heightened scrutiny, making sure that that evidence and testimony that the trial court ruled inadmissible was omitted from consideration and that all of the Rule 404(b) testimony was not considered for the purpose of testing the sufficiency of evidence against Montoya–Ortiz. That the evidence against Montoya–Ortiz is circumstantial and thin, is beyond question. Though they do not expressly say so, my colleagues in the majority opinion implicitly recognize that the evidence against Montoya–Ortiz is thin; they take one-sixth of the space in their opinion to discuss the evidence against Montoya–Ortiz compared with the space in which they discuss the sufficiency of evidence against Montoya–Lujan. Ultimately, my disagreement with the majority turns on the inferences to be drawn from the thin quantity of circumstantial evidence that relates to Montoya–Ortiz's involvement. Essentially the majority sustains the jury verdict against Montoya–Ortiz on the basis of inferences drawn from the following circumstances:

1. The instruction given by Ramos Calderon to Moreno to "wait about 25 minutes and then leave."

2. The explanation which Montoya–Ortiz gave as to going to Presidio to purchase hay.

3. The conduct of Montoya–Ortiz when Moreno was brought into the checkpoint trailer, south of Marfa; and

4. The nervousness which Montoya–Ortiz exhibited and his failure to say good-bye to the deputy sheriff that stopped him near Balmorhea.

For discussion purposes, I treat the last three of these circumstances together, because they were all events testified to by law

enforcement officers and occurred on October 17, 1990, the day of the criminal activity alleged in the indictments. First of all, the statement of going to Presidio to get hay was not in-and-of-itself incorrect. As the majority indicates, there was in fact a farm near Presidio which grew alfalfa hay and that was the type of hay on Montoya–Ortiz's trailer. Clearly, none of the law enforcement officers thought on October 17 that this explanation was sufficiently implausible to justify arresting Montoya–Ortiz, because on two occasions they released him to proceed on his way after giving this explanation. At trial the government elicited testimony about the availability of hay in New Mexico as an *ex post facto* assertion of implausibility. And even the general testimony about availability of hay in New Mexico does not undercut the credibility of Montoya–Ortiz's statement. If Montoya–Ortiz had said, "the nearest place I can get alfalfa hay is in Presidio," then testimony that alfalfa hay was available in New Mexico, which was much closer, would make that statement implausible. Likewise, if the government had offered testimony from the owner and operator of the hay farm near Presidio that Montoya–Ortiz never bought any hay from him; or if the government had offered testimony that Montoya–Ortiz did not own any animals which would eat hay, then the jury could logically infer that Montoya–Ortiz was trying to use his trip to Presidio as a cover for some other activity. But the government did not offer any such proof, and no inference of "possession or knowledge" can reasonably be inferred from Montoya–Ortiz's statement about going to Presidio for hay.

Similarly, whatever conduct Montoya–Ortiz exhibited which the officers at the checkpoint south of Marfa described as "deliberately ignoring" Moreno, cannot sustain any inference of guilt. Moreno clearly testified that he "did not know" Montoya–Ortiz, but only had "seen" him. There is no testimony whatsoever in the record that Moreno ever talked to Montoya–Ortiz or even that Moreno was ever in Montoya–Ortiz's immediate presence. Whatever happened in terms of recognition, or not, among these defendants, it was not perceived on that day by the law enforcement officers as being indicative of any guilt

on the part of Montoya–Ortiz because they allowed Montoya–Ortiz and Ramos Calderon to proceed on their way after Moreno was brought in. Likewise, the much testified about "lead truck/load truck" theory did not ring any bells with the law enforcement officers at the checkpoint south of Marfa. They had both trucks at the secondary inspection point; they had all three occupants of these vehicles in the trailer; the dog alerted to the second truck during the canine sniff inspection; and Ramos Calderon was allegedly "a known narcotics dealer." In spite of the concurrence of all of these circumstances, the officers at the check point obviously concluded that they did not have probable cause to hold Montoya–Ortiz and Ramos Calderon and they let them go. In my book, if the trained officers did not draw the inferences of wrong doing from the circumstances, then those circumstances are insufficient to sustain a jury verdict 14-months later.

The last set of circumstances that occurred on October 17 in the presence of government officers were the events that took place near Balmorhea when the deputy sheriff stopped Montoya–Ortiz's truck pursuant to instructions which he had received from the DEA officers, because the DEA had discovered that the truck which Moreno was driving belonged to Ramos Calderon. The government and the majority opinion make much of the fact that this deputy sheriff was a distant relative of Montoya–Ortiz and that this distant relative testified that Montoya–Ortiz was "extremely nervous" and took off without even saying good-bye, when the officers ultimately released Montoya–Ortiz. The testimony by the deputy sheriff, regarding nervousness was brief and conclusionary. I am continually bothered by the extent to which our Court has recognized "nervousness" as a mantra which police officers can recite to justify further inquiry and search. However, in the rare cases such as this one, where further inquiry and search fails to turn up any objective evidence of wrong doing, then I submit nervousness loses its value as evidence of guilt. I would suggest that "nervousness" is not an atypical reaction when the average citizen is stopped by a police officer. It is the unexpected and the unantic-

ipated confrontation with police officers that gives one the jitters. If we assume that the government's theory of this case is correct, and that Montoya–Ortiz was the leader of the conspiracy that was attempting to smuggle the cocaine in the second truck driven by Moreno, then once Montoya–Ortiz and Ramos Calderon were released from the checkpoint south of Marfa, they would proceed with the knowledge that (i) the second truck had been stopped at the checkpoint, (ii) Moreno had been brought inside for questioning, and (iii) more than likely the canine sniffer which inspected their own vehicle had inspected the second truck. Whether they knew the dog had alerted to the second truck is not clear from the record, but certainly that would be a known and expectable event. Given this knowledge, what course would guilty minds then follow? First they would wait a sufficient period of time somewhere along the route to see whether or not Moreno and his truck were released. The longer they waited, the more likely it became that the second truck had been searched and the cocaine found. When sufficient time elapsed to reach the conclusion that the second truck and its cargo had been compromised, they would have two alternatives. First, to escape, ditch their own trailer, change course, and attempt to avoid apprehension; or proceed along their original course towards home, but being prepared to face the possibility that they would be stopped when the DEA agents checked the registration plates on the second truck and learned that it was registered to Ramos Calderon. When ultimately stopped, the truck and trailer were still on the highway headed most directly back to Montoya–Ortiz's home in Andrews. So under the government's theory, the conspirators did not elect to try to escape; but they would, however, be proceeding with the awareness that at any time they could be stopped, and they had ample time to prepare themselves for that eventuality.

On the other hand, assume, as the law presumes, that Montoya–Ortiz was not involved in the conspiracy, was not aware of the cocaine in the second truck, and was not aware that the second truck belonged to Ramos Calderon. The stop at the Immigration checkpoint south of Marfa was a routine,

and anticipated event, since neither he nor Ramos Calderon were U.S. citizens. After being released at the Immigration checkpoint, they proceeded on their route home; and the stop by the deputy sheriff outside of Balmorhea was an unanticipated event, at least to Montoya–Ortiz. It was the unanticipated circumstance which precipitated his nervousness, rather than guilty knowledge. Once stopped, Montoya–Ortiz had to go through the aggravation of delay until the DEA agents arrived, then the aggravation of having his truck and trailer unloaded and searched and reloaded, and then the upset of having his passenger arrested. That he then left without saying "good-bye" to the deputy sheriff, in my mind does not come even close, to being an indicia of guilt. It is self-evident from the facts of the officers who arrested Ramos Calderon that they did not view the "nervousness" of Montoya–Ortiz as sufficient evidence of probable cause to arrest Montoya–Ortiz too.

Finally, I address the significance of the instruction which Ramos Calderon gave to Moreno at the motel in Presidio. It is important to note that the record clearly establishes that Moreno did not hear what, if anything, Montoya–Ortiz said to Ramos Calderon. The only person that Moreno ever heard say anything was Ramos Calderon. It is also important to note that Ramos Calderon, while named as a defendant in the counts of the indictment, was a fugitive at the time of trial and not present in the courtroom. It is also important to note the content of instruction given by Ramos Calderon. It does not mention Montoya–Ortiz either directly or indirectly. It does not mention anything about lead truck or load truck. It does not mention anything about the cocaine, either expressly or by code name. It does not refer directly or indirectly to the checkpoint south of Marfa. In short, the words used by Ramos Calderon do not raise or suggest any inference whatsoever regarding what, if anything, Montoya–Ortiz may have previously said to Ramos Calderon. In my book, an inference is a conclusion which may be drawn as a matter of logic or as a matter of high probability from other known facts. What Ramos Calderon said to Moreno, cannot be

used to infer knowledge of anything on the part of Montoya–Ortiz. It is possible, of course, as the majority concludes, that Montoya–Ortiz told Ramos Calderon to tell Moreno exactly what he did. It is also possible that whatever Montoya–Ortiz said to Ramos Calderon had absolutely nothing to do with what Ramos Calderon said to Moreno. In short, I cannot agree that any inference flows as a matter of logic or high probability from the words stated by Ramos Calderon to Moreno; and I disagree fundamentally with the precedents relied upon by the majority which use the words "could have found" instead of "would have found" as the criteria by which a reasonable jury would measure the evidence.

For all of the foregoing reasons, I would hold that the evidence was not sufficient to show that there was an agreement on the part of Montoya–Ortiz to enter the conspiracy which Moreno described between himself, Ramos Calderon, and Montoya–Lujan; and since there was no evidence of any kind of any possession by Montoya–Ortiz of the cocaine in question, the conviction of Montoya–Ortiz under counts 1 and 2 should be overturned.